Bernard Levin v. Commissioner.
Levin v. Commissioner
Docket No. 27236.
United States Tax Court
1951 Tax Ct. Memo LEXIS 158; 10 T.C.M. (CCH) 664; T.C.M. (RIA) 51216; July 18, 1951
*158 Petitioner, his wife, daughter and son entered into a partnership agreement to carry on a wholesale jewelry business. Held, under all the facts that petitioner, his wife and daughter were bona fide partners during the taxable years in question. Held, further, petitioner's son was not a bona fide partner during the taxable years in question and respondent did not err in including his share in petitioner's income. Alfred M. Saperston, Esq., 820 Liberty Bk. Bldg., Buffalo, N. Y., for the petitioner. Oscar L. Tyree, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion The respondent determined a deficiency in income tax for the taxable years 1944 and 1945 in the amounts of $11,577.12 and $16,220.88, respectively. The sole issue is whether the Commissioner erred in failing to recognize petitioner's wife, daughter and son as members of a partnership with petitioner and in treating petitioner as a sole proprietor. Findings of Fact Petitioner is an individual residing in Buffalo, New York. Federal income tax returns for the calendar years 1944 and 1945 were filed with the collector of internal revenue for the twenty-eighth district of New York. *159 Many years ago petitioner was in the wholesale jewelry business, assembling and selling rings. Subsequently this business was liquidated and petitioner went into the dress manufacturing business which proved an unsuccessful venture, so that, upon its termination he was penniless, and had to borrow $30,000 on his life insurance to pay creditors. In 1940 petitioner organized the Bernard Jewelry Co., Inc., a New York corporation, whose business was to assemble and sell rings. Since petitioner had no money, as a result of the dress manufacturing venture, he obtained the money for the corporation from a friend, Melvin Wright, and from his nephew, Nathaniel Block. Each of these two men put in $2,505 in exchange for the preferred and common stock (divided equally between them). There was an oral understanding that as soon as petitioner could afford to, he would purchase the stock from them for the amount they had paid. Petitioner was president of the corporation, and his wife, Meta, was secretary. The corporation engaged in the wholesale sale of rings of synthetic and semi-precious stones. The stones were purchased from New York City, and the mountings obtained in Buffalo from manufacturers *160 who also mounted the stones for the corporation. The corporation's office was located at petitioner's home, where a room had been converted into an office. During the life of the corporation, petitioner was the only salesman. He spent the majority of his time traveling. All of the business, except selling, was handled by Meta and Nancy, petitioner's daughter. There were no other employees. Nancy was in her last year of high school at the time the corporation began business. She arranged her class schedule so that she only spent two hours in the morning at school. The rest of the time she worked for the corporation. Meta would do her housework in the morning until the mail arrived, which was about ten o'clock, and then she would start to work on the corporate business. She had previously done the same type of work when petitioner had started in the ring business many years before. Meta taught Nancy all the details of the inside work of the business. The books were set up by an accountant and at first were kept by Meta. But Nancy soon took complete charge of the books and kept them for the remainder of the corporation's life. Nancy knew how to type and she handled all of the *161 correspondence which included billing, setting up statements, ordering stones, letters requesting payment, or explaining reasons for delay in delivery. Orders were sent in from the road by petitioner. They merely gave the ring number and then this was looked up to determine the stone and mounting. The proper mounting (if in stock) and stone would be selected and placed in an envelope. When all the envelopes were assembled they would be carried down to the manufacturer for mounting the stones and finished orders would be picked up. Entries in books would be made noting where the stones and mountings were taken for assembly. These trips entailed two to three hours per day. The stones and mountings were not assembled prior to the receipt of orders from petitioner since the business did not have enough capital to carry a supply of rings with stones already mounted. Both Meta and Nancy performed these tasks, working together, but most of the ordering and the numbering and tagging of stones and mountings was handled by Meta. In addition to selling new rings, petitioner, to create good will, offered to do repair work for his customers. The repair items were sent to Buffalo, and it was *162 a part of Meta's and Nancy's jobs to take the items down to the manufacturers for repairs. If the stone was damaged, a new stone would be selected if available, or else would be ordered. Estimates would be sent to the customers and billing was separate from orders for new rings. At the beginning, neither Meta nor Nancy received any salary, since what money did come in was used as capital for the business to build it up. When the business could afford it, they began drawing small salaries. Meta received $10 which gradually increased to $30 per week, the maximum she received from the corporation. The maximum salary received by Nancy was $40 per week. Neither they nor petitioner considered these amounts adequate, but the corporation could not afford to pay more. By January, 1943, petitioner was able to purchase the stock of the corporation in accordance with the agreement with Messrs. Block and Wright. By personal checks dated January 11, 1943, petitioner gave each of them $1,505 plus a 5 per cent note for $1,000 due July 20, 1943. These notes were paid at maturity. One-half of the stock was transferred to petitioner and one-half to Meta. On advice of counsel, petitioner, who was *163 at home at the time, as was Meta, wrote Meta a letter as follows: "794 West Delavan Avenue Buffalo, New York January 11, 1943 "Dear Meta: "As a slight token of my love and affection, I am herewith giving you the sum of $2505.00 and suggest that you use such amount to purchase twenty-five shares of the preferred stock and fifty shares of the common stock of Bernard Jewelry Company, Inc. "I am arranging to purchase a like amount of such stock for myself. "I sincerely hope that you will continue to enjoy the income from this stock for many years. "Affectionately, "(Sgd) Bernard." Petitioner's son Richard was attending college on a scholarship. He had agreed to go into the business upon completion of his education. He worked during the summer when home on vacation, but never received any salary for his services. However, he entered the Navy in 1943 directly from school, and did no other work for the business through the years in question. Nancy had finished high school in June, 1941, and was anxious to go to college. Petitioner and Meta wanted her to remain at home and continue working for the business. As an inducement to keep Nancy in the business, since they realized a *164 salary of $40 per week was insufficient to hold her interest, and to get Richard to enter the business, petitioner and Meta decided to give their children some of the stock of the corporation. On February 24, 1943, petitioner gave Richard 45 shares of common stock and Meta gave Nancy 20 shares of common stock. These gifts were evidenced by letters written on advice of counsel. At the time Meta and Nancy were both living at home. On March 27, 1943, John Sanborn, a certified public accountant, who checked the corporate books, came in to look at the books. At that time he advised petitioner that the business was increasing substantially and that there would be a large excess profits tax. The sales for the corporate year ended September 1, 1941, were about $38,000, for the year ended September 1, 1942, were about $78,000, and for the period September 1, 1942 until March, 1943, were about $77,000. Since Sanborn knew that Nancy and Richard as well as petitioner and Meta were stockholders, he recommended that an attorney be consulted with respect to the formation of a partnership. Prior to this time there had been no thought or discussion of forming a partnership either between the stockholders, *165 or by any stockholder with an accountant or an attorney. On March 29, 1943, petitioner, Meta, Nancy and Sanborn met with Alfred Saperston, the attorney for the corporation, at the latter's office. Plans for a partnership were considered. It was decided to start the partnership as of April 1, 1943, and an agreement was drawn up and discussed by the parties at other meetings. It was signed during April, but dated April 1. Richard was not present at the meetings, but Saperston had several long distance telephone conversations with him prior to execution of the agreement and then sent him the agreement for his signature. The agreement provided that the firm was to be known as the Bernard Company, and was to continue either until termination by a written agreement or the death of petitioner. Petitioner was to receive $6,000 annually, Meta $1,560, and Nancy $2,080 from profits before any other distribution. If profits were insufficient to pay amounts, each was to receive a pro rata share, and the deficit would be paid in the succeeding years when available. Any profits over and above these amounts were to be divided, or any losses were to be borne, as follows: Petitioner
40%
Meta
20%
Nancy
20%
Richard
20%
*166 Distribution of assets upon dissolution was also to be in the above-mentioned proportion. Petitioner was made the managing partner and his decisions were conclusive and binding on all other partners. He and Meta were given the power to sign checks. All other negotiable instruments could be executed by petitioner or, with petitioner's written consent, by any other partner. Upon the death of Meta, Nancy or Richard, petitioner was given the right to purchase the decedent's share if it had not been transferred to him by succession or will. Value for the share was to be determined from the balance sheet prepared by a certified public accountant for the month in which the death occurred, with no allowance for trade name, good will, or uncompleted portions of contracts. It was originally intended that the corporation continue to operate along with the partnership. This was due to the fact that the corporation had established a credit rating while the partnership had none. It was contemplated that the corporation would continue to purchase merchandise, and that the partnership would handle the assembly and sales. Therefore, the partnership agreement called for capital investments of *167 $1,200 from petitioner and $600 each from Meta, Nancy and Richard. This arrangement was found to be complicated and impractical, so the partnership took over all the operations. The corporation sold its assets (such as accounts receivable and fixtures) to the partnership and at the end of 1943 the corporation was liquidated. Its only asset upon liquidation was cash which was distributed to the stockholders. At the same time the capital investment in the partnership was increased from $3,000 to $12,500 composed of $5,000 from petitioner, and $2,500 each from Meta, Nancy and Richard. The following is a summary of the capital accounts as shown on the books of the partnership: Date
Explanation
Petitioner
Meta
Nancy
Richard
Cumulative
4/ 3/43
Salary drawn on the corporation
$1,000.00
$ 1,000.00
4/17/43
$600.00 check on the corporation
payable to Nancy designated re-
payment of "loan"
$ 300.00
$ 300.00
1,600.00
4/19/43
Petitioner's personal check
1,400.00
3,000.00
10/ 5/43
$2,000.00 check of the corporation
100.00
$ 600.00
400.00
900.00
5,000.00
3/ /44
Loan made by petitioner on 5-31-43
repaid by credit to his capital
account
2,500.00
7,500.00
3/30/44
Personal check of each individual
from proceeds of liquidation of
the corporation
1,900.00
1,800.00
1,300.00
12,500.00
Totals
$5,000.00
$2,500.00
$2,500.00
$2,500.00
*168 When the corporation was begun in 1941 it was in need of money. Nancy and Richard each had a separate thrift account in which they saved money toward college educations. In May, 1941, they withdrew the money and Nancy lent $300 and Richard lent $400 to the corporation, which amounts were entered as loans on the books. Richard was repaid $100 the same month so that each was owed $300. Notes were given but were not introduced into evidence since they could not be located. On April 17, 1943, a check was drawn by the corporation for $600 payable to Nancy. On the face of the check was written "for note". It was endorsed by Nancy over to the partnership and $300 each was credited to Nancy's and Richard's capital accounts, under the same date. The entire amount was made payable to Nancy since Richard was not at home at that time. The cash received by Meta, Nancy and Richard as liquidating dividends was deposited by each in a personal account and personal checks were paid the partnership from such accounts as capital contributions. All salaries, dividends or profits received by Meta, Nancy or Richard either from the corporation of the partnership were deposited in personal accounts and *169 used for personal expenditures. Petitioner had no access to these accounts, nor did he get any part of such moneys. In August, 1943, Nancy again became anxious to attend college. She applied for a partial scholarship at the University of Chicago which she received and she left for school in September, 1943. From that time through the years in question she worked only while on vacations. While she was working she was paid a salary but received none while she was at school. Thus she did not receive the total $2,080 per year provided for in the partnership agreement. When Nancy decided to leave, Miss Rodman, who had worked for petitioner when he formerly was in the jewelry business, was employed to work part time. She kept books, working in the evenings and some Saturdays and Sundays. Another person was employed at the same time to do the typing and billing. Meta also continued to work. Either she or petitioner signed the checks of the partnership. The respondent determined that Meta, Nancy and Richard were not bona fide partners and has determined deficiencies against petitioner for the calendar years 1944 and 1945 on the grounds that all of the profits of the business were attributable *170 and taxable to him. The Bernard Company was a partnership formed April 1, 1943, with the intention as between petitioner, Meta and Nancy, acting in good faith and with a business purpose, that they carry on the business as partners. Petitioner, Meta and Nancy were partners in the operation of the business for the calendar years 1944 and 1945. No such intent existed as to Richard either on his part or on the part of the other parties. Richard was not a partner in the operation of the business for the calendar years 1944 and 1945. Opinion RICE, Judge: The sole issue is whether during the years in question a partnership valid for tax purposes existed as between petitioner, Meta, Nancy and Richard. This is a question of fact which is determined by an examination of all facts and circumstances of record. The intent of the parties is the governing principal and in determining whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise" all the factors leading up to the formation of the partnership must be examined, "* * * the agreement, the conduct of the parties in execution of its provisions, their statements, *171 the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purpose for which it is used, and any other facts throwing light on their true intent." . We have found as a fact that Meta and Nancy were partners for tax purposes. When the corporation was formed in 1941, it was a family enterprise. Petitioner had suffered a severe financial set back and was given a start by friends. Not only petitioner, but also Meta and Nancy, went to work to make the business a success. Nancy and Richard each contributed money they had saved for college. It is, of course, true that sales by petitioner were necessary for the business, but the work performed by Meta and Nancy was just as necessary. Sales would have been meaningless unless someone was at home to fill the orders sent in by petitioner. Meta and Nancy handled all of the repair work which was sent in by customers. Our findings of fact have set forth in detail all the tasks involved both in filling orders for new rings and in taking care of repairs, and these details will not *172 be repeated here. The agreement provided for the manner in which profits were to be divided and losses borne. It is true that the agreement provided that petitioner be the managing partner, but this single factor is insufficient to find that the partnership was not bona fide. Both petitioner and Meta were given authority to sign checks, and Meta often did so. Until Nancy left for college, she did all of the bookkeeping for the business. She also did the typing and handled all the correspondence which included not only billing but also letters to important customers concerning delays, and letters requesting speedy payments which were necessary because of the low capital with which the business was begun, and had to be carefully and diplomatically written in order not to antagonize the customers. Although petitioner purchased the stock of the corporation with his personal checks, he intended that his wife have half of the stock. This is easily understood, since he felt that the business was as much hers and due as much to her efforts as to his. Half of the stock was issued in Meta's name immediately and half in his name. Petitioner and Meta were anxious to have their children *173 in the business. Nancy still wanted to go to college and they hoped that giving her an interest in the business might cause her to change her mind, since they realized that the salary she received was not enough to keep her in the business. They also hoped to attract Richard back home to work in the business. Therefore, on February 24, 1943, Meta gave Nancy 20 shares of common stock and petitioner gave Richard 45 shares of common stock. At this time no thought of a partnership was entertained and none of the gifts of stock were part of a preconceived plan or conditioned upon being put into a partnership. When the partnership was formed the capital was low since the original intention was to continue the corporation and have it do the purchasing. When this arrangement proved awkward, the corporation was dissolved and cash (which was its only asset) was distributed to the stockholders. They invested money in the partnership, each writing a check on his personal account. This money was their own property to do with as each desired. Meta and Nancy each placed any money (either salary or profit distribution) which she received in her personal bank account. It was theirs to use as they *174 desired and petitioner neither had access to it nor ever received any of it. While it is true that in September, 1943, Nancy went away to school and from that time worked intermittently, a careful study of the enumerated factors, plus all others present in the record which led up to the formation of the partnership, has convinced us that petitioner, Meta and Nancy in good faith and with a business purpose intended to, and did, join together in the present conduct of a business enterprise. Respondent therefore erred in including in petitioner's income for 1944 and 1945, the distributive shares of partnership income attributable to Meta and Nancy. The situation is different as to Richard, petitioner's son. He never received any salary from the business. It is true that while he was in college he worked when home on vacations, and that he had indicated his willingness to work in the business after graduation. But he went into the Navy after college without having ever done more than intermittent work in the business. An intent to be partners in the future is insufficient to find a present partnership. The only factor indicative of *175 a partnership was Richard's capital contributions. These consisted of the $300 initially advanced by him to the corporation and then put into the partnership, and the proceeds from the stock he held in the corporation. In the Culbertson case, the Court said: "* * * If the donee of property who then invests it in the family partnership exercises dominion and control over that property - and through that control influences the conduct of the partnership and the disposition of its income - he may well be a true partner. * * * In the Tower [ and Lusthaus [ cases we distinguished between active participation in the affairs of the business by a donee of a share in the partnership on the one hand, and his passive acquiescense to the will of the donor on the other. This distinction is of obvious importance to a determination of the true intent of the parties. * * * [." A contribution of capital is just one of all the factors looked at to determine the intent of the parties and is insufficient in itself to find a valid partnership. There is no evidence which indicates an active partiapation in the *176 business by Richard. On the contrary, the evidence seems to show a passive acquiescence to petitioner's (the donor's) will. Under these circumstances, we hold that the respondent did not err in including in petitioner's income for 1944 and 1945 the distributive share of the partnership income attributable to Richard, since there was no intent that he be a bona fide partner. See . Decision will be entered under Rule 50.